## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JAMES H. SANDEFUR, III,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-11-S-306-NE** |
| | ) | |
| **FEDEX GROUND PACKAGE** | ) | |
| **SYSTEM, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, James H. Sandefur, III, asserts claims against defendant, FedEx Ground Package System, Inc., for racially disparate treatment, racial harassment, and retaliation in violation of 42 U.S.C. § 1981.[1]   The action is before the court on defendant's motion for summary judgment, and plaintiff's motion to strike the affidavit of Kelly Sullinger.[2]   Upon consideration of the parties' briefs and evidentiary submissions, the motion for summary judgment will be granted, and the motion to strike the Sullinger affidavit will be denied as moot.

## I.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 indicates that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any

---

[1] *See* doc. no. 1 (Complaint).

[2] *See* doc. no. 36 (Motion for Summary Judgment); doc. no. 46 (Motion to Strike).

affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration supplied).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> [However,] [t]he mere existence of *some* factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable [factfinder] to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (internal citations omitted) (alterations and emphasis suppled).

## II.  SUMMARY OF FACTS

### A.    The Parties

Defendant, FedEx Ground Package System, Inc. ("FedEx"), is a motor carrier that provides services by entering into operating agreements with independent

contractors.[3]  The agreements grant each contractor a proprietary interest in the right to deliver packages along a specific route — that is, a geographic area designated as the contractor's Primary Service Area ("PSA") — which the contractor can then transfer or sell.[4]  When there exists a route that does not belong to any of the defendant's independent contractors, defendant's local managers can award the route, free of charge, to the most qualified candidate.[5]

Plaintiff, James H. Sandefur, III, is an African-American Jew who was employed as a driver by several of defendant's independent contractors, and who aspired to obtain a route of his own and, thereby, himself become an independent FedEx contractor.  Plaintiff claims that defendant denied him a route on the basis of his race, and in retaliation for his act of filing a charge of discrimination against defendant with the Equal Employment Opportunity Commission.[6]  Further, plaintiff contends that defendant maintained a hostile environment of "racial animus" towards African-Americans.[7]

## B.    The Process of Obtaining a Package Delivery Route

---

[3] Doc. no. 39-2 (Affidavit of Edrie Brodie) ¶ 4-7; *id.*, Exhibit "1" (FedEx Home Delivery Standard Contractor Operating Agreement); *id.*, Exhibit "2" (Policy: Contractor Relations).

[4] *Id.* ¶¶ 8-10; doc. no. 38-1 (Deposition of Barry Johnson), at 22, 105.

[5] Doc. no. 39-2 (Affidavit of Edrie Brodie) ¶ 15.

[6] Doc. no. 1 (Complaint) ¶¶ 20, 30.

[7] *Id.* ¶ 26.

In order to understand plaintiff's arguments, one must understand the process for obtaining a package delivery route.  Throughout his tenure as a driver, plaintiff serviced the routes associated with the Huntsville/Madison Station (also called the Huntsville/Madison Terminal).[8]  The station offers a physical base of operations for drivers employed by defendant's independent contractors, and the station manager (an employee of defendant) oversees the transfer of the routes in the area.[9]

An entity that seeks to acquire a route and, thus, to become an independent contractor, has only three options: to purchase a route from one of defendant's existing contractors; to be awarded a route that was abandoned by a contractor; or, to be awarded a route that was added by defendant.[10]  A station manager's function in the route transfer depends on whether the route is purchased from a contractor or awarded by defendant.[11]

## 1.     The purchase of routes from defendant's existing contractors

Most routes change hands through transactions with defendant's existing contractors.[12]  Although defendant forbids its employees from interfering in transfers

---

[8] *Id.* ¶ 8.

[9] *See* doc. no. 39-2 (Affidavit of Edrie Brodie) ¶ 8.

[10] *Id.* ¶ 13; doc. no. 38-1 (Deposition of Barry Johnson), at 21, 22; doc. no. 37-1 (Deposition of James H. Sandefur, III), at 76.

[11] *See* doc. no. 39-2 (Affidavit of Edrie Brodie) ¶¶ 10, 15; doc. no. 39-1 (Deposition of Edrie Brodie), at 52.

[12] Doc. no. 39-2 (Affidavit of Edrie Brodie) ¶ 14.

4

by dictating the prices or designating the transferees, defendant's station managers must ensure that transferees are incorporated (*i.e.*, are corporate entities), can provide proof of insurance, and either own or possess the ability to own, finance, or lease an approved vehicle in which to transport packages.[13]   If the transferees meet those requirements, then the station managers have "no discretion" and *must* approve them.[14]

### 2.     The award of routes by defendant

If a contractor abandons its route, or if defendant adds a new route, then the route does not belong to any of defendant's contractors, and defendant's station managers can award the route without charge to the candidate deemed most qualified to provide delivery services that comply with defendant's standards.[15]

The decision to add a route is made by defendant's Engineering Department in Pennsylvania, based upon finding an increase in the customer base and package volume in the geographic area.[16]  When making such determinations, the Engineering Department receives no input from defendant's station managers.[17]

---

[13] Doc. no. 39-1 (Deposition of Edrie Brodie), at 31, 32; doc. no. 38-1 (Deposition of Barry Johnson), at 46, 47; doc. no. 37-1 (Deposition of James H. Sandefur, III), at 40, 41, 55, 56.

[14] Doc. no. 39-2 (Affidavit of Edrie Brodie) ¶ 10.

[15] *Id.* ¶ 15; doc. no. 39-1 (Deposition of Edrie Brodie), at 52.

[16] Doc. no. 39-2 (Affidavit of Edrie Brodie) ¶ 11.

[17] *Id.* ¶ 12; doc. no. 39-1 (Deposition of Edrie Brodie), at 50, 51; doc. no. 38-1 (Deposition of Barry Johnson), at 40, 41.

5

When a route becomes available, station employees are required to post a written notice inviting existing contractors to sign the posting and complete internal "Requests for Information."[18]  If no existing contractor expresses an interest, then defendant opens the process to others, including drivers.[19]

### 3.     The service of "supplementals"

In addition to servicing their routes, contractors can service "supplementals": *i.e.*, overflow packages from the other routes associated with their stations.[20]  As is clear from the name, a "supplemental" is intended to supplement a route.  Thus, an entity that does not have an agreement to service a route cannot enter an agreement to service a "supplemental."[21]

## C.     The Transfer of Package Delivery Routes Between October 21, 2008 and January 31, 2011

The only Huntsville/Madison package delivery routes that changed hands between October 21, 2008 and January 31, 2011 were those routes that were transferred between defendant's existing contractors.[22]   None of the existing

---

[18] Doc. no. 39-1 (Deposition of Edrie Brodie), at 66-67; doc. no. 38-1 (Deposition of Barry Johnson), at 27.

[19] Doc. no. 38-1 (Deposition of Barry Johnson), at 26-27.

[20] Doc. no. 39-2 (Affidavit of Edrie Brodie) ¶ 16.

[21] *Id.*; doc. no. 38-2 (Deposition of Randall Charles Gambill), at 151, 152.

[22] Doc. no. 49-2 (Declaration of Edrie Brodie) ¶ 10; doc. no. 49-1 (Declaration of Brian Gilner) ¶ 10.

Huntsville/Madison routes were abandoned, or new routes created, during that period.[23]   Accordingly, no routes were available for the station manager to award free of charge.[24]

## D.   The Racial Composition of Independent Contractors

The Huntsville/Madison Station had a relatively low number of independent contractors (*i.e.*, corporate entities) that were owned or controlled by African-Americans.   Of the twenty-six contractors associated with the station between 2008 and 2010, plaintiff alleges that only one was owned by an African-American.[25] Defendant offers evidence that in 2010, two contractors were owned by African-Americans:   Palmer Dew owned "Dew & Dew, Inc."; and Michelle Williams Cunningham owned "Wisdom Trucking, Inc."[26]

## E.   The Relative Qualifications of Persons Seeking to Become Contractors

The record is devoid of evidence of plaintiff's relative qualifications as compared to others who sought routes in order to become independent contractors. During his employment as a driver, plaintiff alleges that he "gave 100%," and had a

---

[23] Doc. no. 49-2 (Declaration of Edrie Brodie) ¶ 10; doc. no. 49-1 (Declaration of Brian Gilner) ¶ 17.

[24] *Id.*

[25] Doc. no. 39-1 (Deposition of Edrie Brodie), Exhibit 1 ("Defendant's First Responses to Interrogatories and Requests for Production), at 5; doc. no. 38-1 (Deposition of Barry Johnson), at 38-39; doc. no. 41-1 (Motion to Supplement Evidentiary Submission), Exhibit "3" (Plaintiff's First Responses to Requests for Production).

[26] Doc. no. 39-2 (Affidavit of Edrie Brodie) ¶ 21.

"great" delivery record that was superior to the records of others affiliated with defendant's workforce.[27]  Plaintiff is not aware of the qualifications of white persons who sought to acquire independent contractor routes.[28]

Plaintiff has identified three African-Americans who attempted to obtain routes during his affiliation with defendant: *i.e.*, John Stover, a driver who has since gone into business with his wife, Michelle Williams Cunningham, and whose company, "Wisdom Trucking, Inc.," became one of defendant's independent contractors; a person identified only as "Pile"; and, a person whose name plaintiff does not remember.[29]  Plaintiff has no further information about those persons' efforts to acquire or qualifications to be awarded routes.[30]

## F.    Defendant's Anti-Discrimination Policy

Defendant promulgates an anti-discrimination policy that forbids discrimination and harassment against those affiliated with its workforce, including the employees of its independent contractors.[31]  The policy advises victims of discrimination to report

---

[27] Doc. no. 37-1 (Deposition of James H. Sandefur, III), at 23, 68, 75, 76, 81, 86, 88-90, 121, 231, 233, 295, 344, 347, 372, 374, 380.

[28] *Id.* at 83, 84, 130-36.

[29] *Id.* at 57, 186-95.

[30] *Id.* at 190-192.

[31] Doc. no. 39-2 (Affidavit of Edrie Brodie) ¶ 28; *id.*, Exhibit "4" (EEOC Letter); *id.*, Exhibit "5" (Contractor Harassment/Discrimination/Alleged Fraud Report Form); doc. no. 38-1 (Deposition of Barry Johnson), at 60, 61.

the conduct for investigation.[32]  When the victim is the employee of a contractor, he or she can report the discrimination to defendant's "Contractor Relations Department."[33]

Although defendant contends that its employees posted the anti-discrimination policy at the Huntsville/Madison Station,[34] plaintiff claims that he was not aware of the policy.[35]  Further, Charles Gambill (the owner of plaintiff's former employer, the corporate entity named "Charles Gambill, Inc.") testified that he did not know how defendant makes employees of contractors aware of its anti-discrimination policy.[36]

## G.   Plaintiff's Employment by Temporary Staffing Agency Adecco

Plaintiff first became affiliated with defendant's workforce in 2003, when he was employed by "Adecco," a temporary staffing agency, and assigned to work as a driver at the Huntsville/Madison Station for one of defendant's contractors.[37]

---

[32] Doc. no. 39-2 (Affidavit of Edrie Brodie) ¶ 30; *id.*, Exhibit "4" (EEOC Letter); *id.*, Exhibit "5" (Contractor Harassment/Discrimination/Alleged Fraud Report Form); doc. no. 39-1 (Deposition of Edrie Brodie), at 55, 57; doc. no. 38-2 (Deposition of Randall Charles Gambill), at 102.

[33] Doc. no. 39-2 (Affidavit of Edrie Brodie) ¶ 28.

[34] *Id.* ¶ 30; *id.*, Exhibit "4" (EEOC Letter); *id.*, Exhibit "5" (Contractor Harassment/Discrimination/Alleged Fraud Report Form); doc. no. 39-1 (Deposition of Edrie Brodie), at 55, 57; doc. no. 38-2 (Deposition of Randall Charles Gambill), at 102.

[35] Doc. no. 37-1 (Deposition of James H. Sandefur, III), at 300-01.

[36] Doc. no. 38-2 (Deposition of Randall Charles Gambill), at 103.  Mr. Gambill is referred to variously throughout the record as, *e.g.*, "Charles Randall Gambill," "Randall Charles Gambill," and "Charles Gambill."  Mr. Gambill's business is also referred to variously as, *e.g.*, "Charles Randall Gambill, Inc." and "Charles Gambill, Inc."

[37] Doc. no. 41-1 (Motion to Supplement Evidentiary Submission), Exhibit "1" (Contractor/Driver Information Sheet).

9

Between 2003 and 2005 or 2006, plaintiff alleges that defendant "thwarted" his efforts to acquire a route two times.[38]

Plaintiff first claims that Huntsville/Madison Station Manager Marcus Whitfield promised to award plaintiff a new route in 2003 or 2004.[39] Whitfield later told plaintiff that defendant decided not to add the route because it had too little business in the area to justify creating a new route.[40]

Plaintiff also contends that, in 2004, Glen Boatwright promised to give plaintiff the route owned by Boatwright's contractor, if plaintiff agreed to pay for Boatwright's truck.[41] Defendant allegedly prevented the transfer by suspending plaintiff for service issues.[42]

## H.   Plaintiff's Hiatus from Affiliation with Defendant

During 2005 or 2006, plaintiff concluded that the business of driving a delivery truck for defendant's contractors had become "slow."[43] As a consequence, he took a

---

[38] Doc. no. 1 (Complaint) ¶ 20.

[39] Doc. no. 1 (Complaint) ¶¶ 8, 9; doc. no. 37-1 (Deposition of James H. Sandefur, III), at 76, 77.

[40] *Id.*

[41] Doc. no. 1 (Complaint) ¶ 10; doc. no. 37-1 (Deposition of James H. Sandefur, III), at 121-124. Mr. Boatwright's first name is spelled variously throughout the record as, *e.g.*, "Glen" and "Glenn."

[42] *Id.*

[43] Doc. no. 37-1 (Deposition of James H. Sandefur, III), at 15-18, 19, 20; doc. no. 41-1 (Motion to Supplement Evidentiary Submission), Exhibit "7" (Contractor/Driver Information Sheet), at FXG 327.

two-year break from affiliation with defendant, and devoted his efforts to speaking at engagements, publishing rap music, and promoting his book, "To Fiend Fore Life," (sic), which he wrote under the pseudonym of "Ambassador Deathrite."[44]  The book was published in conjunction with the Writers Regime Publishing company, an unincorporated partnership between plaintiff and his ten-year-old daughter.[45]

While plaintiff was on leave from his affiliation with defendant, the Huntsville/Madison Station had two available routes, one created by defendant's Engineering Department in 2006, and the other in 2007.[46]  Because existing contractors were not interested in the routes, the station manager awarded them to "Charles Gambill, Inc." and an entity named "Mohammed Ali Shams," both of which did not have a preexisting contractual relationship with defendant.[47]

## I.    Plaintiff's Employment by Dew & Dew, Inc.

Plaintiff resumed his affiliation with defendant's workforce on October 21, 2008, when he was employed as a driver at the Huntsville/Madison Station by "Dew & Dew, Inc.," a contractor owned by Palmer Dew, an African-American.[48]  Although

---

[44] *Id.*

[45] *Id.*

[46] Doc. no. 37-1 (Deposition of James H. Sandefur, III), at 10.

[47] Doc. no. 49-1 (Declaration of Brian Gilner) ¶¶ 15, 16.

[48] Doc. no. 39-2 (Affidavit of Edrie Brodie) ¶ 21; doc. no. 37-1 (Deposition of James H. Sandefur, III), at 369.

plaintiff and Dew had a conflict over the wages paid plaintiff, plaintiff also saw Dew

as his mentor regarding the process of acquiring a route and becoming a contractor.[49]

### 1.    Plaintiff's alleged efforts to acquire a route

Throughout his affiliation with defendant, plaintiff sent a series of electronic

mail ("e-mail") messages to Huntsville/Madison Station Manager Joe McSorley to

express his opinions and frustrations regarding his employment conditions.[50]  In an e-

mail dated November 26, 2008, plaintiff informed McSorley that he wanted to be

considered for the next available route in the Athens, Alabama area.[51]  The following

year, plaintiff sent McSorley two e-mails, one asking about acquiring a route,[52] and

the other recounting his difficulties in obtaining a route, and reiterating that the

Huntsville/Madison Station had over twenty contractors, only one of whom was

African-American.[53]  The e-mails did not result in his acquisition of a route.

### 2.    Plaintiff's alleged exposure to a racially hostile environment

Plaintiff alleges that, during his employment with Dew & Dew, Inc., he was

---

[49] Doc. no. 37-1 (Deposition of James H. Sandefur, III), at 50, 255-58; doc. no. 42-1 (Untitled Document), Exhibit "25" (E-Mail Dated February 16, 2010 from Sandefur to McSorley).

[50] *See* doc. no. 37-1 (Deposition of James H. Sandefur, III), at 254, 255, 258, 259, 262, 263, 269, 270, 277, 278; doc. no. 42-1 (Untitled Document), Exhibits "18"-"21," "25" "26" (E-Mails from Sandefur to McSorley).

[51] Doc. no. 42-1 (Untitled Document), Exhibit "3" (E-Mail Dated November 6, 2008 from Sandefur to McSorley), at 0000593.

[52] *Id.*, Exhibit "3" (E-Mail Dated September of 2009 from Sandefur to McSorley), at 0000601.

[53] *Id.* at 0000602.

12

subjected to a racially hostile environment at the Huntsville/Madison Station, but offers inconsistent accounts of the frequency and duration of the harassment.  In his complaint, plaintiff alleges that defendant's contractors used racially abusive language at the Huntsville/Madison Station during the run-up to the 2008 presidential election between Senator Barack Obama and Senator John McCain.[54]

At his deposition, plaintiff testified that Charles Abercrombie, the owner of contractor "ABCO Enterprises, Inc.," referred to President-Elect Barack Obama as a "black socialist son of a bitch" three times at most in November of 2008.[55]  Further, plaintiff testified that Fred Smith, who also owned a contractor, told plaintiff to move his "black ass" to another parking spot one time in December of 2008, after the election.[56]  Smith later apologized and never used such language again.[57]  Plaintiff also contended that the use of racially offensive language was not limited to the period of the election, and that it continued unabated for two years.[58]

Plaintiff then testified that he verbally reported the remarks "[a]bout Obama and

---

[54] Doc. no. 1 (Complaint) ¶ 13.

[55] Doc. no. 37-1 (Deposition of James H. Sandefur, III), at 249, 250, 306.

[56] *Id.* at 261, 262, 266.

[57] *Id.*  In his declaration, plaintiff (apparently referring to the aforementioned comments by Abercrombie and Smith) claimed that white contractors used the expressions "Muslim son of a bitch" and "black son of a bitch" when referring to President Obama, and the expression "[move] your black ass" when conversing with plaintiff.  *Id.*, Exhibit "1" (Declaration of James H. Sandefur, III) ¶ 10 (alteration supplied).

[58] *Id.*

the election" to Huntsville/Madison Station Manager Joe McSorley in November of 2008, but that he did not discuss the "other racial slurs" with McSorley,[59] and that he did not include those concerns in the many e-mails he sent to McSorley during and after the election period.[60]  According to plaintiff, McSorley counseled him to raise his concerns with his employer (*i.e.*, Palmer Dew); when plaintiff followed that advice, Palmer Dew cautioned him to no "rock the boat."[61]  Plaintiff denies reporting the harassment to any other person until 2010.  *See* Section II(J)(2), *infra*.

## J.    Plaintiff's Employment by Gallagher Freightways

In 2009, plaintiff ended his employment with Dew & Dew, Inc., and began his employment with "Gallagher Freightways, LLC," a contractor owned by Hugh Gallagher.[62]

### 1.    Plaintiff's alleged efforts to acquire a route

A contractor owned by Bobby Brown placed its route on the market in March of 2010.[63]   When plaintiff tried to purchase the route, he alleges that

---

[59] *Id.* at 250-51 (alteration supplied).

[60] Doc. no. 37-1 (Deposition of James H. Sandefur, III), at 254, 255, 258, 259, 262, 263, 269, 270, 277, 278; doc. no. 42-1 (Untitled Document), Exhibits "18"-"21," "25" "26" (E-Mails from Sandefur to McSorley).

[61] *Id.* at 300-01.

[62] *Id.* at 255-57; *see also* doc. no. 42-1 (Untitled Document), Exhibit "20" (E-Mail Dated August 26, 2009 from Sandefur to McSorley) (discussing plaintiff's employment with Gallagher Freightways).

[63] Doc. no. 38-2 (Deposition of Randall Charles Gambill), at 70-73, 87; doc. no. 37-1 (Deposition of James H. Sandefur, III), at 94-97, 246-247.

14

Huntsville/Madison Station Manager Joe McSorley interfered in the transaction by telling Brown that he could not sell the route to a driver.[64]  (During his deposition, plaintiff offered the apparently inconsistent testimony that *he* balked when Brown raised the quoted price.[65])  Brown then sold his route to "ABCO Enterprises, Inc.," a contractor owned by Charles Abercrombie.[66]

### 2.    Plaintiff's complaint against defendant and Gallagher Freightways

In an e-mail dated March 15, 2010, and addressed to defendant's Contractor Resources Specialist, Barry Johnson, plaintiff made two separate claims of wrongdoing: *i.e.*, racial and gender discrimination by defendant; and improper payment by certain contractors.  First, plaintiff criticized defendant's business model as an impediment to the diversity of the contractor workforce at the Huntsville/Madison Station.[67]  Further, plaintiff contended that some contractors did not honor their obligations to deduct taxes before paying their employees' wages.[68]  Plaintiff did not mention his allegations of racial harassment.[69]  The following month,

---

[64]   Doc. no. 38-1 (Deposition of Barry Johnson), Exhibit "5" (Contractor Harassment/Discrimination/Alleged Fraud Report Form), at FXG 678, 679.

[65]   Doc. no. 37-1 (Deposition of James H. Sandefur, III), at 94-95.

[66]   Doc. no. 38-2 (Deposition of Randall Charles Gambill), Exhibit "2D" (Bill of Sale), at FXG 700.

[67]   Doc. no. 38-1 (Deposition of Barry Johnson), Exhibit "3" (Letter Dated March 15, 2010 from Sandefur to Johnson).

[68]   *Id.*

[69]   *Id.*

plaintiff reiterated those claims to Paul Callahan, defendant's Senior Vice President of Contract Relations, and Edrie Brodie, its Senior Contractor Relations Manager in a letter dated April 26, 2010.[70]

Brodie referred the matter for internal investigation in May of 2010, and Contractor Resources Specialist Johnson received the assignment.[71]   Johnson was authorized only to examine evidence, and was not allowed to award a route to plaintiff.[72]   During his interview with Johnson, plaintiff claimed that defendant impeded his efforts to acquire three routes: *i.e.*, the route allegedly promised to plaintiff by Huntsville/Madison Station Manager Whitfield in 2003 or 2004; the route offered by Glen Boatwright in 2004; and, the route sold by Bobby Brown in 2010.[73] Plaintiff contends that he also discussed his claims of harassment, but that Johnson did not include those concerns in his report.[74]   Johnson denies that plaintiff raised the issue of harassment.[75]

_____

[70]  Doc. no. 37-1 (Deposition of James H. Sandefur, III), at 255-57; doc. no. 42-1 (Untitled Document), Exhibit "15" (Facsimile Dated April 26, 2010 from Sandefur to Callahan and Brodie). Mr. Brodie's first name is spelled variously throughout the record as, *e.g.*, "Edrie" and "Erdie."

[71]  Doc. no. 39-2 (Affidavit of Edrie Brodie) ¶ 24-26; doc. no. 38-1 (Deposition of Barry Johnson), at 65-66.

[72]  Doc. no. 39-2 (Affidavit of Edrie Brodie) ¶ 26.

[73]   Doc. no. 38-1 (Deposition of Barry Johnson), at 72-75; *id.*, Exhibit "5" (Contractor Harassment/Discrimination/Alleged Fraud Report Form); *id.*, Exhibit "6" (Johnson Memo), at FXG 683.

[74]  Doc. no. 37-1 (Deposition of James H. Sandefur, III), at 303-04.

[75]  Doc. no. 38-1 (Deposition of Barry Johnson), at 72-75.

After reviewing defendant's records and interviewing the witnesses plaintiff had identified, Contractor Resources Specialist Johnson concluded that plaintiff had not established the truthfulness of the allegation that defendant prevented him from obtaining a route, because plaintiff had not proven that he attempted to obtain a route.[76]  As noted in the discussion in Section II(B)(1) of this opinion, *supra*, defendant requires that entities acquiring a route either own, or have the ability to own, finance, or lease, an approved vehicle in which to transport packages.[77]  As part of his investigation, Johnson called Bush Truck & Leasing ("Bush") to confirm plaintiff's statement that Bush had agreed to finance his vehicle, and he was advised that Bush had no record of plaintiff either having applied for, or being approved for credit.[78]  Plaintiff also had no bill of sale showing an agreement to purchase a route.[79]

Further, Contractor Resources Specialist Johnson found no evidence of

---

[76]  Doc. no. 38-1 (Deposition of Barry Johnson), Exhibit "5" (Contractor Harassment/Discrimination/Alleged Fraud Report Form), at FXG 676; *id.*, Exhibit "6" (Johnson Memo), at FXG 683, 684; doc. no. 37-1 (Deposition of James H. Sandefur, III), at 140.

[77]  Doc. no. 39-1 (Deposition of Edrie Brodie), at 31, 32; doc. no. 38-1 (Deposition of Barry Johnson), at 46, 47; doc. no. 37-1 (Deposition of James H. Sandefur, III), at 40, 41, 55, 56.

[78]  Doc. no. 38-1 (Deposition of Barry Johnson), at 106, 107; *id.*, Exhibit "5" (Contractor Harassment/Discrimination/Alleged Fraud Report Form), at FXG 676; *id.*, Exhibit "6" (Johnson Memo), at FXG 683; doc. no. 41-1 (Motion to Supplement Evidentiary Submission), Exhibit "8" (Bush Subpoena); *id.*, Exhibit "9" (Affidavit of John Catalano).

[79]  Doc. no. 38-1 (Deposition of Barry Johnson), Exhibit "5" (Contractor Harassment/Discrimination/Alleged Fraud Report Form), at FXG 676; *id.*, Exhibit "6" (Johnson Memo), at FXG 683, 684; doc. no. 37-1 (Deposition of James H. Sandefur, III), at 140.

disparate treatment based on race.[80]    When Johnson asked plaintiff whether Huntville/Madison Station Manager Joe McSorley discriminated against him, plaintiff answered "no."[81] John Stover, an African-American driver also interested in acquiring a route from the entity owned by Bobby Brown, denied that McSorley influenced Brown's decision to sell the route to ABCO Enterprises, and described the decision as "nobody's fault but the Brown's [sic]."[82] Johnson attributed the low number of contractors owned by African-Americans to the fact that existing contractors preferred to sell their routes to other existing contractors, and the fact that defendant prohibited employees from interfering in transfers by designating the transferees.[83]

Accordingly, Contractor Resources Specialist Johnson did not recommend corrective action on plaintiff's allegations of racial discrimination, but did recommend further investigation of plaintiff's assertion that his employer, Gallagher Freightways, was avoiding its obligation to deduct taxes before paying wages by misclassifying plaintiff and other employees as independent contractors.[84]    After investigating

---

[80]    Doc. no. 38-1 (Deposition of Barry Johnson), Exhibit "5" (Contractor Harassment/Discrimination/Alleged Fraud Report Form), at FXG 677, 678; *id.*, Exhibit "6" (Johnson Memo), at FXG 682-85.

[81] *Id.*, Exhibit "5" (Contractor Harassment/Discrimination/Alleged Fraud Report Form), at FXG 678.

[82] *Id.*, Exhibit "6" (Johnson Memo), at FXG 684.

[83] *Id.* at 90-92; *id.*, Exhibit "6" (Johnson Memo), at FXG 683.

[84] *Id.*, Exhibit "6" (Johnson Memo), at FXG 685.

plaintiff's allegation against Gallagher Freightways, defendant elected to terminate its operating agreement, and thereby revoke its contractor status.[85]  During his deposition, plaintiff testified that Hugh Gallagher, the owner of Gallagher Freightways, might believe that plaintiff "squealed" on him, and that "Gallagher would think I'm the man who cost him his job."[86]

### 3.    Plaintiff's alleged exposure to a racially hostile environment

Plaintiff alleges that defendant's contractors intensified their use of racially abusive language at the Huntsville/Madison Station in the wake of Contractor Resources Specialist Johnson's investigation.[87]  During his affiliation with defendant's workforce, plaintiff was "great friends" with Steve Kelso, the owner of a contractor, who gave plaintiff help and advice on obtaining a route.[88]  Plaintiff claims that Kelso joked about plaintiff's meeting with Johnson by saying:  "If Barry Johnson doesn't get things straightened out we'll hire one of those hook nose [sic] Jew lawyers like the ones on T.V."[89]  Plaintiff also contends that Kelso used the expressions "black ass," "big black bitch," and "bet your black ass" after May or June of 2010.[90]

---

[85] Doc. no. 38-2 (Deposition of Randall Charles Gambill), at 25, 26, 82-84; doc. no. 37-1 (Deposition of James H. Sandefur, III), at 104, 107 -111.

[86] Doc. no. 37-1 (Deposition of James H. Sandefur, III), at 110-11.

[87] *Id.* at 251-52.

[88] *Id.* at 56, 234, 235, 294.

[89] *Id.* at 251, 252, 286, 287, 291, 294.

[90] *Id.* at 266.

Plaintiff testified that Steve Kelso made the joke about "hook nose [sic] Jew lawyers" to plaintiff only once, and that plaintiff just "shunned it off."[91]   Kelso allegedly made that joke to white persons with legal issues on other occasions.[92] Plaintiff could not remember how many times Kelso made comments about "black[s]."[93]   Plaintiff allegedly ended his friendship with Kelso as a result of the comments.[94]

Although plaintiff alleged that defendant's contractors began to use abusive language in 2008, and persisted in using such language over the course of the next two years, *see* Section II(I)(2), *supra*,[95] plaintiff could recall no other times when someone used an offensive term, and no other person who used such terms.[96]   Plaintiff did not report the alleged harassing statements.[97]

## K.   The Sale of Routes by Contractor Gallagher Freightways to Contractor Gambill, Inc.

If defendant notifies a contractor that defendant intends to not renew, or to terminate, its operating agreement, the contractor has a period of time to sell its

---

[91] *Id.* at 251, 252, 286, 287, 291, 294.

[92] Doc. no. 37-1 (Deposition of James H. Sandefur, III), at 290-94.

[93] *Id.*

[94] *Id.* at 293-94; doc. no. 42, Exhibit "20" (E-Mail Dated August 26, 2009 from Sandefur to McSorley).

[95]  *Id.*, Exhibit "1" (Declaration of James H. Sandefur, III) ¶ 10 (alteration supplied).

[96] *Id.* at 306.

[97] *Id.* at 291, 302.

20

routes.[98]   Accordingly, when defendant informed Hugh Gallagher, the owner of plaintiff's employer, Gallagher Freightways, that its contract would be terminated, Gallagher offered to sell its three routes to the highest bidder.[99]

Plaintiff alleges that he and Gallagher discussed the possibility that plaintiff might purchase the routes, but Gallagher was only willing to sell plaintiff a supplemental route for $25,000.[100]  When Gallagher did not get back to plaintiff about the transaction, plaintiff did nothing further, preferring to wait and "let the chips fall" where they may.[101]

On August 10, 2010, plaintiff allegedly discovered two unsigned, form bills of sale for routes that listed Steve Kelso as the seller, Charles Gambill as the buyer, and the purchase price as $1.00.[102]  Plaintiff then learned that Hugh Gallagher sold the three routes owned by Gallagher Freightways to Charles Gambill, Inc., a contractor owned by Charles Gambill.[103]

Based on his discovery of the bills of sale, and his observation that Steve Kelso,

---

[98] Doc. no. 39-2 (Affidavit of Edrie Brodie) ¶ 14; doc. no. 37-1 (Deposition of James H. Sandefur, III), at 99, 100.

[99] *See* doc. no. 38-2 (Deposition of Randall Charles Gambill), at 25, 26, 47-49, 82-84; doc. no. 37-1 (Deposition of James H. Sandefur, III), at 104, 107 -111.

[100] Doc. no. 37-1 (Deposition of James H. Sandefur, III), at 122-23.

[101] *Id.* at 243, 244.

[102] *Id.* at 102-06; doc. no. 42, Exhibit "4" (EEOC Letter), at SANDEFUR 0004-0005.

[103] *Id.*

Charles Gambill, and Huntsville/Madison Station Manager Joe McSorley spent time together, plaintiff testified that Kelso, Gambill, and McSorley conspired to award the routes owned by Gallagher Freightways to Gambill, Inc. for $1.00.[104]  Plaintiff then offered the apparently incongruous testimony that he does not know whether Gambill offered Gallagher more money or a better deal that plaintiff's offer of $25,000.[105]

In response, defendant has submitted three signed bills of sale dated July 28, 2010, showing that Hugh Gallagher sold the three routes owned by Gallagher Freightways to Gambill, Inc. for $60,000, plus an additional sum for Gallagher's trucks.[106]  Indeed, plaintiff cites Charles Gambill's deposition for the proposition that "Gambill agreed to pay $20,000.00 per route for three routes (financed by the seller). [Doc.# 38-2- Gambill Dep. p. 47]."[107]

## L.     Plaintiff's Employment by Gambill, Inc.

Under the terms of the bills of sale, the assignment of routes from Gallagher Freightways to Gambill, Inc. became effective on September 1, 2010.[108]  After acquiring Gallagher Freightways' routes, Gambill, Inc. hired back all of Gallagher

---

[104] *Id.* at 104-106; *id.*, Exhibit "1" (Declaration of James H. Sandefur, III) ¶ 18.

[105] *Id.* at 107-09.

[106] Doc. no. 38-2 (Deposition of Randall Charles Gambill), at 25, 26, 47-49, 82-84; *id.*, Exhibit "2A" (Bills of Sale); doc. no. 37-1 (Deposition of James H. Sandefur, III), at 104, 107 -111.

[107] Doc. no. 47 (Response to Motion for Summary Judgment), at 11 (alterations in original).

[108] Doc. no. 39-2 (Affidavit of Edrie Brodie) ¶ 30; doc. no. 38-2 (Deposition of Randall Charles Gambill), Exhibit "2A" (Bills of Sale).

Freightways' drivers, including plaintiff.[109]

### 1.    Plaintiff's EEOC charge against defendant

In a charge of discrimination that was filed with the Equal Employment Opportunity Commission ("EEOC") on September 9, 2010, plaintiff alleged that defendant engaged in racial discrimination, and, retaliation for his complaints of racial discrimination, by denying him the opportunity to purchase a route and become a contractor.[110]  Plaintiff argued that every time he applied for a route between April 30 and August 10, 2010, the route "was given to a less qualified White person."[111] Plaintiff did not include his allegations of harassment.[112]  The EEOC dismissed the charge upon finding that plaintiff was not an employee of defendant.[113]

Plaintiff only told one person at the Huntsville/Madison Station about his EEOC charge: *i.e.*, John Stover, the African-American driver who was also interested in acquiring a route from the entity owned by Bobby Brown.[114]  Plaintiff did *not* tell

---

[109]  Doc. no. 38-2 (Deposition of Randall Charles Gambill), at 82-84; doc. no. 37-1 (Deposition of James H. Sandefur, III), at 50-52.

[110]  Doc. no. 39-2 (Affidavit of Edrie Brodie) ¶ 29; *id.*, Exhibit "6" (Notice of Charge of Discrimination); *id.*, Exhibit "7" (Charge of Discrimination).

[111]  *Id.*, Exhibit "6" (Notice of Charge of Discrimination);  Exhibit "7" (Charge of Discrimination).

[112]  *Id.*

[113]  Doc. no. 41-1 (Motion to Supplement Evidentiary Submission), Exhibit "4" (EEOC Letter), at SANDEFUR 009.

[114]  Doc. no. 37-1 (Deposition of James H. Sandefur, III), at 56, 57, 108-111, 119, 120.

Huntsville/Madison Station Manager Joe McSorley, Bobby Brown, Charles Gambill, Hugh Gallagher, or Steve Kelso.[115]  Indeed, Gallagher, who might have believed that plaintiff "cost him his job" by reporting his improper payroll practices to defendant,[116] had transferred his contractor's routes to Gambill, Inc., and ended his affiliation with defendant by the time plaintiff filed his charge.[117]

None of the persons who worked at the Huntsville/Madison Station (including Huntsville/Madison Station Manager Joe McSorley, Charles Gambill, and Steve Kelso) told plaintiff that they knew he had filed an EEOC charge.[118]  Plaintiff nevertheless assumed that McSorley and Gambill were aware of the charge, allegedly because they were always meeting and talking, and because of whispers, and the way people looked at him.[119]

### 2.    Plaintiff's termination

In a text message dated January 19, 2011, plaintiff informed his employer, Gambill, Inc., that, "[when] class time [arrives], I'll be going [to school], no matter

---

[115] *Id.*

[116] *Id.* at 110-11.

[117] Doc. no. 39-2 (Affidavit of Edrie Brodie) ¶ 30; doc. no. 38-2 (Deposition of Randall Charles Gambill), Exhibit "2B" (Huntsville Transition Agreement), at FXG 689-95.

[118] Doc. no. 37-1 (Deposition of James H. Sandefur, III), at 56, 57, 58, 108-11.

[119] *Id.* at 108-11.

what[ packages are] on the truck [awaiting delivery]."[120]   As a result of the message, Gambill terminated plaintiff's employment as a delivery truck driver.[121]   Plaintiff then contacted "every contractor with FedEx" about the possibility of working for them,[122] including Charles Abercrombie and Steve Kelso, both of whom plaintiff accuses of engaging in racial harassment.[123]   *See* Section II(I)(2), *supra.*   However, the contractors proved unwilling to offer plaintiff employment, and plaintiff now works as a manager of archives at the University of Alabama.[124]

### III.  MOTION TO STRIKE

Plaintiff asks this court to strike the affidavit of Senior Contractor Settlement Manager Kelly Sullinger because defendant did not identify Sullinger in its initial and supplemental disclosures as a person likely to have information on which defendant may rely.[125]   Federal Rule of Civil Procedure Rule 37(c)(1) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified *or is harmless*"

---

[120] *Id.* at 28-32; doc. no. 41-1 (Motion to Supplement Evidentiary Submission), Exhibit "44" (Forwarded Text Message Dated January 19, 2011).

[121] Doc. no. 38-2 (Deposition of Randall Charles Gambill), at 112.

[122] Doc. no. 37-2 (Deposition of James H. Sandefur, III), at 127-28.

[123] Doc. no. 37-1 (Deposition of James H. Sandefur, III), at 251, 252, 286, 287, 291, 294.

[124] Doc. no. 37-2 (Deposition of James H. Sandefur, III), at 7-8, 128-130.

[125] Doc. no. 46 (Motion to Strike), at 1.

(alteration and emphasis supplied).   Plaintiff argues that defendant's failure to

disclosure Sullinger is *not* harmless because:

> On whether Primary Services Areas vacancies existed in Madison County Alabama between 2008 and 2010, Sullinger's testimony is in conflict with Edrie Brodie, Senior Manager Contract Relations. Sullinger alleges there were no vacancies for primary services area. [Doc. 39-3, ¶ 7].   Brodie, who had responsibility for that location, testified that he believed vacancies existed during that time period. [Doc. 39-1, pg. 52 lines 14-16] [Defendant's] Interrogatory identifies thirteen contracts that ended during that same time period.  [Doc. 39-1 pg. 68]. It is unclear if those contracts were reassigned through sales between contractors or by [defendant].  Further the role of [defendant] in how those transfers remains unknown, and [plaintiff] contends the McSorely the station manager blocked his attempts to acquire a route through the transfer process.[126]

Defendant admits its failure to disclose Senior Contractor Settlement Manager

Sullinger as a witness in its initial and supplemental disclosures.[127]   However,

defendant argues that the failure is harmless because it used Sullinger as a substitute

records custodian in place of Pick-Up & Delivery Manager Brian Gilner, a witness

disclosed in its initial disclosures who was unavailable when defendant's motion for

summary judgment was due.[128]   Alternatively, defendant urges this court to deny

plaintiff's motion to strike as moot because other witnesses identified in defendant's

---

[126] *Id.* at 1-2 (alterations denoting citations in original) (other alterations supplied).

[127] Doc. no. 50 (Response to Motion to Strike), at 2.

[128] *Id.* at 2, 6, 7.

initial disclosures have provided "the same or similar testimony."[129]   Sullinger

testifies, in pertinent part, as follows:

> From October 21, 2008 until the end of January 2011, there were
> no new primary service areas created for the Huntsville, Alabama Home
> Delivery station.   Likewise, there were no primary service areas
> abandoned by existing independent contractors during that timeframe
> such that they were available for Defendant to award.[130]

After plaintiff filed his motion to strike the affidavit from Senior Contractor

Settlement Manager Sullinger, defendant submitted declarations from Senior

Contractor Relations Manager Brodie and Pick-Up & Delivery Manager Gilner.[131]

Brodie testified that "[n]o routes were created by the Engineering Department or

abandoned by [contractors] between 2008 and 2011."[132]  Likewise, Gilner testified that

"[Contractor Driver Administration & Settlement database] records show that no

routes were created by Engineering or abandoned by [contractors] between October

21, 2008 and January, 2011."[133]  Plaintiff has not challenged the admissibility of the

declarations from Brodie and Gilner.

Upon comparison, the affidavit of Senior Contractor Settlement Manager

---

[129] *Id.* at 8-9.

[130] Doc. 39-3 (Affidavit of Kelly Sullinger) ¶ 7.

[131] *See* doc. no. 49 (Evidentiary Submissions); doc. no. 49-2 (Declaration of Edrie Brodie); doc. no. 49-1 (Declaration of Brian Gilner).

[132] Doc. no. 49-2 (Declaration of Edrie Brodie) ¶ 10.

[133] Doc. no. 49-1 (Declaration of Brian Gilner) ¶ 17.

Sullinger, and the declarations of Senior Contractor Relations Manager Brodie and Pick-Up & Delivery Manager Gilner, contain substantially similar statements regarding the creation and abandonment of routes between October 21, 2008 and January, 2011.[134] Indeed, this court has written the summary of facts without resorting to evidence from the challenged affidavit, relying on Brodie and Gilner's declarations, as well as other evidence in the record.  Because the admission of Sullinger's affidavit does not affect this court's analysis of defendant's motion for summary judgment, plaintiff's motion to strike will be denied as moot.

## IV.  MOTION FOR SUMMARY JUDGMENT

Plaintiff alleges that defendant engaged in discrimination, harassment, and retaliation in violation of 42 U.S.C. § 1981.[135]  The statute of limitations for actions arising under § 1981 is four years.  *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 381 (2004); *Baker v. Birmingham Board of Education*, 531 F.3d 1336, 1338 (11th Cir. 2008).  Because plaintiff filed his complaint on January 31, 2011,[136] any claims arising from events occurring before January 31, 2007 are barred by the statute of limitations.  Accordingly, this court will not consider plaintiff's contentions that defendant impeded his efforts to receive a route from Huntsville/Madison Station

---

[134] Doc. no. 49-1 (Declaration of Brian Gilner) ¶ 17.

[135] *See* doc. no. 1 (Complaint).

[136] *Id.*

Manager Whitfield in 2003 or 2004, and from contractor Glen Boatwright in 2004.[137]

Section § 1981 prohibits "racial discrimination in the making and enforcement of contracts." *Little v. United Technologies, Carrier Transicold Division*, 103 F.3d 956, 961 (11th Cir. 1997).[138] Claims for discrimination under that statute "have the same requirements of proof and use the same analytical framework" as claims for discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). *Standard v. A.B.E.L. Services*, 161 F.3d 1318, 1330 (11th Cir. 1998).

Under the "analytical framework" referenced in *A.B.E.L.*, the plaintiff bears the

---

[137] *See, e.g.*, doc. no. 38-1 (Deposition of Barry Johnson), at 72-75; *id.*, Exhibit "5" (Contractor Harassment/Discrimination/Alleged Fraud Report Form); *id.*, Exhibit "6" (Johnson Memo), at FXG 683.

[138] Section 1981 provides as follows:

(a) Statement of equal rights.  All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined.  For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment.  The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.

initial burden of establishing a *prima facie* case of intent to discriminate. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993). By establishing a *prima facie* case, the plaintiff "creates a presumption that the employer unlawfully discriminated against the employee." *Burdine*, 450 U.S. at 254.

The effect of the presumption of discrimination is to shift to the employer the burden of producing, but not proving, some legitimate, nondiscriminatory reason for the contested employment action. *See McDonnell Douglas*, 411 U.S. at 802. To satisfy the burden of production, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254-55 (citation and footnote omitted).

Once the defendant bears its burden of production, "the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citations omitted), *cert. denied sub nom. Combs v. Meadowcraft Co.*,

522 U.S. 1045 (1998).

> [T]his circuit's post-*Hicks* decisions uniformly hold that once a plaintiff
> has established a *prima facie* case and has put on sufficient evidence to
> allow a factfinder to disbelieve an employer's proffered explanation for
> its actions, that alone is enough to preclude [summary judgment or] entry
> of judgment as a matter of law.

*Combs*, 106 F.3d at 1532 (alterations supplied).

## A.    Racially Disparate Treatment

To establish a *prima facie* case of racial discrimination based on failure to

contract in violation of 42 U.S.C. § 1981, a plaintiff must show that: (1) he is a

member of a protected class; (2) he submitted an application meeting the requirements

for an available contract; (3) his application was rejected; and (4) the contract was

awarded to a person outside his protected class.  *Brown v. American Honda Motor

Co., Inc.*, 939 F.2d 946, 949 (11th Cir. 1991); *Rustein v. Avis Rent-Car Systems, Inc.*,

211 F.3d 1228, 1235 (11th Cir. 2000); *Jimenez v. Wellstar Health Systems*, 596 F.3d

1304, 1308 (11th Cir. 2010). A plaintiff proceeding under § 1981 must also prove

intentional discrimination.  *General Building Contractors Association. v.

Pennsylvania*, 458 U.S. 375, 391 (1982); *Brown*, 939 F.2d at 949.   Plaintiff's

complaint alleges the following:

> From 2003 to the present, FedEx Ground Package System, Inc.
> has repeatedly denied Plaintiff the opportunity to receive a delivery route
> while similarly situated whites received such routes on a regular basis.

> Plaintiff was thwarted in his attempts to gain a delivery route on at least two occasions by white FedEx Ground Package System, Inc. officials. Plaintiff has been denied these routes because of his race African-American.[139]

Plaintiff cannot maintain his discrimination claim because he cannot establish that he submitted an application *to defendant*, that his application was rejected *by defendant*, or that the contract was awarded to any else *by defendant*. *See Brown*, 939 F.2d at 949. As discussed in Section IV(A), *supra*, plaintiff's claims arising from events occurring before January 31, 2007 are barred by the statute of limitations. Hence, discussion will center on the two routes that plaintiff alleges he attempted to acquire since 2007: *i.e.*, the route sold by the contractor owned by Bobby Brown to ABCO Enterprises in March of 2010; and, the route sold by the contractor owned by Hugh Gallagher to Gambill, Inc., in July of 2010.[140]   Because none of the routes associated with the Huntsville/Madison Station were created or abandoned between October 21, 2008 and January 31, 2011, none were available for the station manager to award free of charge.[141]

The record is devoid of evidence to suggest that defendant influenced Brown and Gallagher's independent choice of buyers.  Defendant prohibits employees from

---

[139] Doc. no. 1 (Complaint) ¶ 20.

[140] Doc. no. 38-2 (Deposition of Randall Charles Gambill), at 70-73, 87; doc. no. 37-1 (Deposition of James H. Sandefur, III), at 94-97, 246-247.

[141] Doc. no. 49-2 (Declaration of Edrie Brodie) ¶ 10; doc. no. 49-1 (Declaration of Brian Gilner) ¶ 17.

interfering in transfers of routes by dictating the prices or designating the transferees.[142]   Plaintiff alleges that Steve Kelso, Charles Gambill, and Huntsville/Madison Station Manager Joe McSorley (an employee of defendant) conspired to award the routes owned by Gallagher Freightways to Gambill, Inc., based on his discovery of *unsigned*, *form* bills of sale for routes that contained Kelso and Gambill's names, and his observation that Kelso, Gambill, and McSorley spent time together.[143]   However, defendant has submitted three *signed* bills of sale showing that Gallagher sold the routes to Gambill, Inc. for $60,000, plus an additional sum for Gallagher's trucks.[144]   Indeed, plaintiff cites Gambill's deposition for the proposition that he "*agreed to pay $20,000.00 per route for three routes*."[145]

"For factual issues to be considered genuine, they must have a real basis in the record."  *Mize v. Jefferson City Board of Education*, 93 F.3d 739, 742 (11th Cir. 1996).  The Eleventh Circuit is clear that "an inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation."  *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321,

---

[142] *See id.* ¶¶ 8-9; doc. no. 39-1 (Deposition of Edrie Brodie), at 31, 32; doc. no. 38-1 (Deposition of Barry Johnson), at 46, 47, 54-56, 59, 86, 87, 105; doc. no. 37-1 (Deposition of James H. Sandefur, III), at 40, 41, 55, 56.

[143] *Id.* at 104-106; *id.*, Exhibit "1" (Declaration of James H. Sandefur, III) ¶ 18.

[144] Doc. no. 38-2 (Deposition of Randall Charles Gambill), at 25, 26, 47-49, 82-84; *id.*, Exhibit "2A" (Bills of Sale); doc. no. 37-1 (Deposition of James H. Sandefur, III), at 104, 107 -111.

[145] Doc. no. 47 (Response to Motion for Summary Judgment), at 11 (citing doc. no. 38-2 (Deposition of Randall Charles Gambill), at 47) (emphasis supplied).

1324 (11th Cir. 1983); *see also CBS Broadcasting, Inc. v. EchoStar Communications Corp.*, 450 F.3d 505, 518 n.25 (11th Cir. 2006) (holding that, for summary judgment purposes, "an inference based on speculation and conjecture is not reasonable") (internal citation omitted).  "Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (internal citation omitted).

Plaintiff's theory that Steve Kelso, Charles Gambill, and Huntsville/Madison Station Manager Joe McSorley conspired to award the routes owned by Gallagher Freightways to Gambill, Inc., is pure speculation, with no connection to the inferences that can *reasonably* be drawn from the evidence in the record.  Because plaintiff has failed to establish that defendant influenced Brown and Gallagher's independent choice of buyers, this court will grant summary judgment on plaintiff's claim for disparate treatment.

## B.    Retaliation

Title VII's "opposition clause" protects an employee who "oppose[s] any practice made an unlawful employment practice."  42 U.S.C. § 2000e–3(a); *see also Equal Employment Opportunity Commission v. Total System Services, Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000).  To establish a *prima facie case* of retaliation, a plaintiff

34

must show that: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action. *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994).

Demonstrating a casual linkage at the summary judgment stage is far less onerous than proving causation by a preponderance of the evidence at trial. At the summary judgment stage, "a plaintiff merely has to prove that the protected activity and the negative employment action are not *completely unrelated*." *Meeks*, 15 F.3d at 1021(emphasis supplied) (quoting *EEOC v. Reichhold Chemical, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)).

"At a minimum, a plaintiff must generally establish that the employer was *actually aware* of the protected expression at the time it took the adverse employment action." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (emphasis supplied); *see also, e.g., Gupta v. Florida Board of Regents*, 212 F.3d 571, 590 (11th Cir. 2000); *Farley v. Nationwide Mutual Insurance*, 197 F.3d 1322, 1337 (11th Cir. 1999).

Plaintiff's complaint alleges the following:

> FedEx Ground Package System, Inc. retaliated against the Plaintiff for complaining of race discrimination in employment and racial harassment. Specifically, Plaintiff first complained internally of a lack

35

of diversity in the IC ranks and of racial harassment.  In August 2010, Plaintiff lodged an external complaint with the EEOC for racial discrimination.  In September 2010, Plaintiff was yet again denied a delivery route.  *Plaintiff was denied a delivery route because of his prior EEO activity.*[146]

In greater detail, plaintiff claims that:

> In September 2010, three more routes became available and the Plaintiff expressed an interest in being considered for one of them [the route Plaintiff sought consideration for was the one that he was working at the time].  Plaintiff's request was ignored and FedEx Ground Package System, Inc awarded all three routes to Charles Gambill, Inc.[Charles Gambill, Inc. is owned by white male IC Randall Charles Gambill].  Plaintiff continued working the supplemental route for Gambill.  FedEx Ground Package System, Inc. never explained to Plaintiff why he was not considered for the route he was already servicing.  *FedEx Ground Package System, Inc. denied Plaintiff this route because of his race and in retaliation for his prior EEO activity.*[147]

Plaintiff cannot maintain his retaliation claim because he cannot establish a causal connection between his protected activity and the sale of the routes owned by Gallagher Freightways to Gambill, Inc.  *See Meeks*, 15 F.3d at 1021.  According to plaintiff's complaint, he filed a charge with the EEOC in *August* of 2010.[148]  However, the charge is actually dated *September 9*, 2010.[149]  The bills of sale for the three routes

---

[146] Doc. no. 1 (Complaint) ¶ 30 (alteration and emphasis supplied).

[147] *Id.* ¶ 16 (alterations in original) (emphasis supplied).

[148] Doc. no. 1 (Complaint) ¶ 30.

[149]  Doc. no. 39-2 (Affidavit of Edrie Brodie), Exhibit "7" (Charge of Discrimination).

36

owned by Gallagher Freightways are dated *July 28, 2010*.[150]   Thus, the sale of the routes could not have occurred in retaliation for an EEOC charge filed more than a month *later*.

In his response in opposition to summary judgment, plaintiff argues that he engaged in various other forms of protected reporting activity, which create an independent basis for his retaliation claim:

> First, [plaintiff] complained to [Huntsville/Madison Station Manager] McSorley in or around November 2008 about race discrimination and racial slurs.   Second, on March 15, 2010, [plaintiff] e[-]mailed [Contractor Resources Specialist] Johnson to complain about race discrimination. Third, on April 26, 2010, [plaintiff] mailed written complaints of race discrimination to [defendant's] officials[,] [Senior Vice President of Contract Relations] Callahan and [Senior Contractor Relations Manager] Brodie. Fourth, in May 2010, [plaintiff] lodged verbal complaints of race discrimination and racial harassment to Johnson.[151]

Assuming that plaintiff's complaint is sufficient to notify defendant that his retaliation claim is based on his complaints to McSorley, Johnson, Callahan, and Brodie, *as well as* his EEOC charge, and assuming those complaints constitute protected activity within the meaning of Title VII's "opposition clause," plaintiff has presented no evidence to establish a connection between the choice of buyers by *Hugh Gallagher*, and an act or omission by *defendant's employees*.   *See* Section IV(B)(1), *supra*.

---

[150] Doc. no. 38-2 (Deposition of Randall Charles Gambill), at 25, 26, 47-49, 82-84; *id.*, Exhibit "2A" (Bills of Sale); doc. no. 37-1 (Deposition of James H. Sandefur, III), at 104, 107 -111.

[151] Doc. no. 47 (Response to Motion for Summary Judgment), at 25-26 (alterations supplied).

Accordingly, this court will grant summary judgment on plaintiff's retaliation claim.

## C.      Racial Harassment

> To establish a hostile work environment claim, [a plaintiff] must show:  (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008) (alteration supplied) (internal citation and quotations omitted).  The requirement that harassment be "severe or pervasive" contains an objective and subjective component.  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002).  "Thus, to be actionable, this behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives to be abusive."  *Id.* (internal citation and quotations omitted).

> In evaluating the objective severity of the harassment, we look at the totality of the circumstances and consider, *inter alia*: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance;  and (4) whether the conduct unreasonably interferes with the employee's job performance." [*Miller.*, 277 F.3d at 1276.] . . . Teasing, offhand comments, and isolated incidents that are not extremely serious will not amount to discriminatory changes in the terms and conditions of employment. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (*en banc*).  For example, we have stated that "racial slurs allegedly

38

> spoken by coworkers had to be so 'commonplace, overt and denigrating that they created an atmosphere charged with racial hostility.'" *Edwards* [*v. Wallace Community College*], 49 F.3d [1517,] 1521 [(11th Cir. 1995)] (quoting *EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir. 1990)).

*Alexander v. Opelika City Schools*, 352 F. App'x 390, 392 (11th Cir. 2009) (alterations supplied).

> Plaintiff's complaint alleges the following:

> Plaintiff was forced to work with and around [independent contractors] who either openly expressed a general disdain for African-Americans or by their indifference, approved their discriminatory treatment. White employees did not have to work in an environment where racial animus against them was openly displayed.[152]

In greater detail, plaintiff contends that:

> In November 2008, the terminal was engulfed in racial tension leading up to the presidential election. White [independent contractors] verbally expressed their disgust at the election of President Barack Obama and used demeaning language to refer to him and African-Americans in general in the presence of [defendant's] managers. White [independent contractors] used terms such as "get your black ass out of here," "Muslim son-of-a-bitch [Obama]," "black son-of-a-bitch [Obama]," "black bitch" [when addressing African-American women], "black ass," "big black bitch" [when addressing African-American women], "you bet your black ass," and "hook nose jew" [Plaintiff is African-American and Jewish].[153]

> In his declaration, plaintiff claimed that the use of racially offensive language

---

[152] Doc. no. 1 (Complaint) ¶ 26 (alterations supplied).

[153] Doc. no. 1 (Complaint) ¶ 13 (alterations describing the parties supplied) (all other alterations in original).

was *not* limited to the run-up to the 2008 presidential election, and that it continued unabated for two years.[154]  Plaintiff testified that Charles Abercrombie, the owner of contractor ABCO Enterprises, Inc., referred to President Barack Obama as a "black socialist son of a bitch" at most three times in November of 2008.[155]  Further, plaintiff testified that Fred Smith, who also owned a contractor, told plaintiff to move his "black ass" to another parking spot one time in December of 2008.[156]  Smith later apologized and never used such language again.[157]

Two years later, plaintiff asserts that Steve Kelso, who was both the owner of a contractor and a "great" personal friend of plaintiff, made several off-color remarks. After plaintiff discussed his complaints regarding his working conditions with Contractor Resources Specialist Johnson in May of 2010, Kelso allegedly joked that,"If Barry Johnson doesn't get things straightened out we'll hire one of those hook nose [sic] Jew lawyers like the ones on T.V."[158]  Further, Kelso allegedly used the expressions "black ass," "big black bitch," and "bet your black ass" after May or June of 2010.[159]

---

[154] Doc. no. 37-1 (Deposition of James H. Sandefur, III), Exhibit "1" (Declaration of James H. Sandefur, III) ¶ 10.

[155] *Id.* at 249, 250, 306.

[156] *Id.* at 261, 262, 266.

[157] *Id.*

[158] *Id.* at 251, 252, 286, 287, 291, 294.

[159] *Id.* at 266.

Plaintiff testified that Steve Kelso made the joke about "hook nose [sic] Jew lawyers" to plaintiff only once, and that plaintiff just "shunned it off."[160]  Kelso allegedly made that joke to white persons with legal issues on other occasions.[161] Plaintiff could not remember how many times Kelso made comments about "black[s]."[162]  Plaintiff could recall no other times when someone used an offensive term, and no other person who used such terms.[163]  Upon consideration, those allegations fall short of establishing the existence of *objectively* "severe and pervasive" harassment.  *See Miller.*, 277 F.3d at 1276.

In *McCann v. Tillman*, 526 F.3d 1370 (11th Cir. 2008), *cert. denied*, 129 S. Ct. 404 (2008), and *Alexander v. Opelika City Schools*, 352 F. App'x 390 (11th Cir. 2009), the Eleventh Circuit affirmed the grant of summary judgment in favor of employers on claims of hostile work environment by African-American employees. The *McCann* plaintiff accused two coworkers of using the words "girl," "boys," and "nigger bitch" to refer to the plaintiff and three African-American colleagues.  *Id.* at 1378-79.  The Eleventh Circuit held that, "[a]lthough offensive, such instances of racially derogatory language alone, extending over a period of more than two years,

---

[160] Doc. no. 37-1 (Deposition of James H. Sandefur, III), at 251, 252, 286, 287, 291, 294.

[161] *Id.* at 290-94.

[162] *Id.*

[163] *Id.* at 306.

[were] too sporadic and isolated to establish that her employers' conduct was []
objectively severe and pervasive[.]" *Id.* at 1379 (alterations supplied).

Similarly, the *Alexander* plaintiff alleged that his coworkers "constantly" used
the word "boy" to refer to him, and that a supervisor asked him how to tie a noose
around a person's neck. *Id.* at 393. In upholding the grant of summary judgment in
the employer's favor, the Eleventh Circuit noted that the plaintiff "could only recall
eight specific instances over the course of two years where he was called 'boy.'" *Id.*
Further, the comment about the noose "was not directed toward [the plaintiff], and
[the plaintiff] testified that he did not know whether this comment referred to black
people." *Id.* (alterations supplied). Finally, "none of the alleged racial comments
contained threats of physical violence, and he did not demonstrate that the comments
interfered with his job performance." *Id.*

Plaintiff's allegations bear striking similarities to those in *McCann* and
*Alexander*. First, although plaintiff alleges that the harassment continued unabated
for two years,[164] plaintiff has identified no more than ten "specific instances over the
course of two years" when anyone used an offensive term at the Huntsville/Madison
Station. *Alexander*, 352 F. App'x at 393. Of those terms, only the words "get your
black ass out of here," "black ass," and "you bet your black ass" were directed at

---

[164] Doc. no. 37-1 (Deposition of James H. Sandefur, III), Exhibit "1" (Declaration of James
H. Sandefur, III) ¶ 10.

plaintiff.[165]   Indeed, Steve Kelso's alleged joke about "hook nose [sic] Jew lawyers" was a reference to the *religion* of defendant's potential attorneys, and thus does not support a hostile environment claim based on *racial* harassment towards plaintiff.[166]  Further, "none of the alleged racial comments contained threats of physical violence, and [plaintiff] did not demonstrate that the comments interfered with his job performance."  *Alexander*, 352 F. App'x at 393.  Because those remarks to do not constitute objectively severe and pervasive racial harassment, this court will grant summary judgment on plaintiff's claim for hostile environment.

## V.  CONCLUSION

For the reasons explained above, defendant's motion for summary judgment is GRANTED, and all claims of plaintiff are dismissed with prejudice.  Plaintiff's motion to strike the affidavit of Kelly Sullinger is DENIED as moot.  Costs are taxed to plaintiff.  The Clerk is directed to close this file.

DONE and ORDERED this 14th day of February, 2013.

United States District Judge

---

[165] *See* doc. no. 1 (Complaint) ¶ 13 (identifying the individuals at whom the comments were directed).

[166] *See id.* at 8 (designating plaintiff's hostile environment claim as one for *racial* harassment).